[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13014
_____

Agency No. A200-859-149

XUEJUN CHEN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 11, 2014)

Before JORDAN, Circuit Judge, and BARTLE,[*] and BERMAN,[**] District Judges.

_____

[*]   Honorable Harvey Bartle III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[**]  Honorable Richard M. Berman, United States District Judge for the Southern District of New York, sitting by designation.

PER CURIAM:

Xuejun Chen, a native and citizen of China, petitions for review of the Board of Immigration Appeals' ("BIA") decision affirming the Immigration Judge's ("IJ") denial of his application for cancellation of removal, under § 240A(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229b(b), withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c).  After careful review of the record, and with the benefit of oral argument, we deny Mr. Chen's petition.[1]

## I.    Background

We presume the parties' familiarity with the facts and the record, and set out only what is necessary to explain our decision.

Mr. Chen entered the United States without inspection in November of 1999. He first stopped in Houston, was then driven to Los Angeles and eventually flew to

---

[1] Mr. Chen has <u>not</u> appealed the denial of his September 27, 2010 petition for asylum in which he contended that he would be subject to persecution and torture if he were returned to China because he had fathered two children (in the U.S.) allegedly in violation of China's family-planning policy.  Mr. Chen's asylum petition was denied on April 20, 2011 because it was filed nearly ten years too late and because the evidence did not show any extraordinary circumstances which prevented timely filing.  *See* Assessment to Refer, No. A200859149, dated Apr. 20, 2011 ("[A]pplicant had one year from his latest arrival, approximately November 18, 1999 until November 17, 2000 to file his asylum application in a timely manner.  Applicant filed an asylum application on September 27, 2010, ultimately accepted on October 8, 2010 and therefore is untimely.").

New York where he was met by his father's friend, Xue Xian Wu. Mr. Wu took Mr. Chen to Virginia, where they stayed for approximately two months. Mr. Chen then returned to New York to look for a job and through a "job finding company" was sent to different business locations in New York and Washington, D.C. He appears to have resided in New York until 2001.

In February of 2006, Mr. Chen married Yu Yun Zheng, a native of China and a United States citizen. They have two children, who were born in the U.S. in 2006 and 2008, respectively. The Chens currently reside in Georgia where they run a family-owned restaurant.

Approximately one month after the denial of Mr. Chen's asylum petition, on May 23, 2011, the Department of Homeland Security ("DHS") issued a Notice to Appear stating that Mr. Chen was removable from the U.S. as an alien present without being admitted pursuant to INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Mr. Chen subsequently applied for cancellation of removal, withholding of removal, and CAT relief, claiming that if he were removed to Fujian Province in China, the Chinese government would forcibly sterilize him and/or subject him to a serious fine because he had violated China's family planning policy by having two children without permission.

On March 14, 2012, following a hearing at which Mr. Chen was represented by counsel, the IJ denied Mr. Chen's application(s). With respect to cancellation

3

of removal, the IJ found that Mr. Chen "failed to provide credible evidence of his continuous physical presence in the United States from at least ten years prior to the filing of the Notice to Appear." *In the Matter of Xuejun Chen*, A200–859–149 (Immig. Ct. Atlanta, GA, March 14, 2012), at 9–10.  The IJ pointed out that Mr. Chen relies largely on his own "self-serving" and general testimony and the testimony of Mr. Wu to establish his physical presence in the United States.  The IJ also noted that Mr. Chen made no effort to corroborate such testimony.  *Id.* at 8–9. Finally, the IJ found that Mr. Chen "has not discharged his burden of presenting reasonably available documents concerning his presence in the United States."  *Id.* at 9.

With respect to withholding of removal, the IJ found that Mr. Chen "has not **credibly** established that given the high standard necessary for withholding of removal that the Chinese government will subject him to persecution in China if he were to return."  *Id.* at 13 (emphasis added).  And, the IJ denied CAT relief because Mr. Chen "has not established that it is more likely than not that he'll be tortured in China if he's required to return to that country."  *Id.* at 14.

Mr. Chen appealed to the BIA which affirmed the IJ's decision.  The BIA held that "[u]pon de novo review, we agree with the Immigration Judge's conclusion that the respondent did not meet his burden of proof to show that he had the ten years of continuous physical presence required for cancellation of

4

removal." *In re Xuejun Chen*, No. A200–859–149 (B.I.A. June 7, 2013), at 2. The BIA also held that Mr. Chen "has not met his burden of proof for withholding of removal or protection under CAT," finding no pattern or practice of persecution by the Chinese government because of the birth of his two children in the United States. *Id.* at 2–3.

## II.    Standard of Review

Where, as here, the BIA affirms the IJ's decision, and also issues a separate opinion, we review only the BIA's opinion "except to the extent the BIA expressly adopts the IJ's decision." *Mu Ying Wu v. U.S. Atty. Gen.*, 745 F.3d 1140, 1153 (11th Cir. 2014) (citation and internal quotation marks omitted). "We have found that the BIA expressly adopted an IJ's decision where the BIA either agreed with the IJ's findings or relied on the IJ's reasoning, and in those circumstances, we review[] both the IJ's and the BIA's decisions to that extent." *Id.*

We review legal determinations *de novo* and factual determinations under the "substantial evidence test," *see D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 817-18 (11th Cir. 2004), viewing the record evidence in the light most favorable to the agency's decision and drawing all reasonable inferences in favor of that decision. *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004). "We must affirm the BIA's decision if [as here] it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (citation and internal

5

quotation marks omitted).   We may reverse "only when the record compels a reversal." *Id.*

## III.    Analysis

Mr. Chen's applications for relief from removal are governed by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005), which provides, in relevant part, the following:

> [i]n evaluating the testimony of the applicant or other witness in support of the application, the immigration judge will determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof.  In determining whether the applicant has met such burden, the immigration judge shall weigh the credible testimony along with other evidence of record. Where the immigration judge determines that the applicant should provide evidence which corroborates otherwise credible testimony, such evidence must be provided unless the applicant demonstrates that the applicant does not have the evidence and cannot reasonably obtain the evidence.

8 U.S.C. § 1229a(c)(4)(B).[2]   "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable."  8 U.S.C. § 1252(b)(4)(D).

---

[2] The REAL ID Act states that § 101(a)(3), amending 8 U.S.C. § 1158(b)(1)(B)(ii), "shall apply to applications for asylum, withholding, or other relief from removal."  Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 231, 305.

6

**A. <u>Ten Years of Continuous Physical Presence</u>**

Under 8 U.S.C. § 1229b(b)(1), "[t]he Attorney General may cancel removal of . . . an alien who is inadmissible or deportable from the United States if the alien: (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; (B) has been a person of good moral character during such period; (C) has not been convicted of [certain offenses]; and (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." Regarding the requisite ten years of continuous physical presence, "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear." 8 U.S.C. § 1229b(d)(1).

In this case, both the IJ and the BIA concluded that Mr. Chen did not establish ten years of continuous presence immediately preceding the issuance of the Notice to Appear on May 23, 2011. While the IJ did not make an explicit adverse credibility finding regarding Mr. Chen's testimony, he did in fact conclude that Mr. Chen's testimony was "generally self-serving" and lacking in detail. *See In the Matter of Xuejun Chen* (Immig. Ct. Atlanta, GA, March 14, 2012), at 3 ("The respondent is not quite sure what airport he ended up in once he got into

New York."); *id.* at 4 ("The respondent has not explained why his family has to go to New York to see doctors."); *id.* at 8 ("He had confirmed that he stayed at a motel in New York but doesn't have any documents and does not recall the exact name.  He said that he stayed in Madison Street in New York but doesn't have any information from that."); *see also Seriani v. U.S. Atty. Gen.*, 334 F. App'x. 308, 311 (11th Cir. 2009) (where "[a]lthough the IJ and the BIA did not find Seriani incredible, they found her testimony to be weak, given its vague and confusing nature").

The IJ determined that "[it is] not unreasonable in this case [for there to be corroborating] documents given the length of Respondent's residence in the United States" but that Mr. Chen had failed to produce such documents to bolster his testimony.[3]  *See In the Matter of Xuejun Chen* (Immig. Ct. Atlanta, GA, March 14, 2012), at 9 ("The Respondent traveled back and forth from New York to Virginia back to New York and again to Washington D.C.  He made no effort to corroborate any of this.  He stayed in hotels and made no efforts to get documents from the hotels.  He traveled and sent money back to China but has no documents to corroborate any of this.").  The IJ concluded that Mr. Chen "failed to provide

---

[3] At the hearing before the IJ, Joy Lampley, Assistant Chief Counsel of the Department of Homeland Security, asked Mr. Chen: "So you lived in several places when you came to the United States, correct?"  Mr. Chen answered "Yes."  Ms. Lampley responded: "Yet you do not have any documents today to show how long you [have] lived in the United States like leases or bills that you've paid?  Mr. Chen answered: "No."  When the IJ asked Mr. Chen's attorney "what is the best document that I need to look at to show that he was here at some point back then?" Mr. Chen's attorney responded "[d]ocumentary proof I do not have."

credible evidence of his continuous physical presence in the United States from at least ten years prior to the filing of the Notice to Appear." *Id.* at 9–10.

The BIA agreed with the IJ's conclusion that Mr. Chen did not meet his burden of demonstrating that he had ten years of continuous physical presence as required for cancellation of removal. Among other things, Mr. Chen "did not provide detailed testimony as to [the time period May 23, 2001 to May 23, 2011]." *In re Xuejun Chen* (B.I.A. June 7, 2013), at 2. "[The] evidence and testimony [presented] is not sufficient to show that the respondent had the requisite continuous physical presence." *Id.*

The IJ and BIA's finding that Mr. Chen failed to demonstrate his continuous presence is supported by substantial evidence. Mr. Chen's presentation does not "compel the conclusion" that he was continuously present in the United States for ten years. Mr. Chen's testimony lacked significant detail (and support) regarding his presence in the United States from May 2001 to May 2011. While he testified generally about working in and traveling to New York, Virginia, and Washington D.C., he was unable to provide any specific details regarding these events or experiences, which in any event appear to have occurred prior to 2001. Indeed,

9

Mr. Chen did not provide any testimony clearly supporting the relevant 10-year period.[4]

On this record, the IJ acted within his discretionary authority in requiring Mr. Chen to produce corroborating evidence. *See* 8 U.S.C. § 1229a(c)(4)(B) (expressly empowering the IJ to require corroborating evidence even when the applicant has provided otherwise credible testimony); *see also* 8 U.S.C. § 1158(b)(1)(B)(ii) (same); *Seriani*, 334 F. App'x. at 311 (where the BIA found that the IJ made no adverse credibility finding but denied relief "because Seriani failed to satisfy her burden of proof by not producing sufficient corroborating evidence."); *cf. Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005) (pre-REAL ID Act case) ("The weaker an applicant's testimony . . . the greater the need for corroborative evidence.").

The record shows that Mr. Chen failed to produce credible evidence—testimonial or documentary—to corroborate his own testimony. For example, while Mr. Wu's testimony corroborated Mr. Chen's presence in the United States

---

[4] Mr. Chen also testified that he and his wife sent both of their children to live with his parents in Fujian Province, China approximately three months after each child's birth in 2006 and 2008. Mr. Chen failed to explain who took his infant daughters to China or who brought them back to the United States. At oral argument on this appeal on June 12, 2014, the following colloquy took place: The Court: "How did the children get back to China? The record doesn't indicate, does it? The children did go back to China and they were such a young age, they certainly didn't do it on their own." Mr. Chen's Counsel: "Correct. In these types of cases, that's very common—that the children will go back to China with a relative to visit the relatives in China, but the record is not clear on how the children did get back. They could have gone back with his wife who did have status in the United States. But the record doesn't indicate any of that." Oral Argument at 13:20, *Chen v. U.S. Att'y Gen.*, No. 13-13014 (11th Cir. June 12, 2014).

for (roughly) two months after Mr. Chen's arrival in November of 1999, that two-month period is outside the continuous physical presence period of May 23, 2001 to May 23, 2011. And while Mr. Wu also testified that he spoke with Mr. Chen over the telephone after Mr. Chen entered the United States and that he never knew Mr. Chen to have left the country, he provided no details, such as the telephone number he used to contact Mr. Chen, the dates of their conversations, or how he knew that Mr. Chen was (continuously) present in the United States during or between the phone calls.

Mr. Chen's wife testified, via affidavit dated February 22, 2012, and stated that she met Mr. Chen in 2003, that they "have lived together from the summer of 2005 to the present, and [they] have had no periods of separation from each other since that time." But Ms. Zheng was not able to corroborate Mr. Chen's continuous physical presence in the United States between 2001 and 2003.

Mr. Chen provided his tax returns from 2001 through 2010. He did not, however, prepare those returns until February of 2012 and none of the returns included supporting documentation such as W-2s or paystubs. Mr. Chen also presented a partial Chinese passport issued to him in 2008 in New York. This document does not, of course, establish his continued presence for the requisite ten year period (and perhaps raises some question as to whether he left the U.S. between 2008 and 2011).

11

Nothing in the record compels the conclusion that such corroborating evidence was unavailable to Mr. Chen.  *See* 8 U.S.C. § 1252(b)(4)(D).  As the IJ correctly noted, "[it is] not unreasonable in this case [for there to be] documents given the length of Respondent's residence in the United States."  *In the Matter of Xuejun Chen* (Immig. Ct. Atlanta, GA, March 14, 2012), at 9.

We conclude that substantial evidence supports the BIA's decision to affirm the IJ's conclusion that Mr. Chen failed to establish that he had ten years of continuous physical presence in the United States.

## B. <u>Withholding of Removal</u>

An alien seeking withholding of removal under the INA "bears the burden of demonstrating that it is 'more likely than not' [he] will be persecuted or tortured upon being returned to [his] country."  *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005) (quoting *Fahim v. U.S. Att'y Gen.*, 278 F.3d 1216, 1218 (11th Cir. 2002)).  An alien may meet his burden of proof as to "persecution" in two ways.  *See Tan v. U.S. Atty. Gen.*, 446 F.3d 1369, 1375 (11th Cir. 2006).  "First, an alien may establish past persecution in his country based on a protected ground."  *Id.* (citation and internal quotation marks and alterations omitted).  Second, an alien who has not shown past persecution, such as Mr. Chen, "is entitled to withholding of removal if [he] establishes that it is more likely than not that [he] would be persecuted on account of race, religion, nationality,

12

membership in a particular social group, or political opinion upon removal to that country."  *Id.* (internal quotation marks and brackets omitted).  Mr. Chen's withholding of removal claim rests (solely) upon alleged fear of future persecution, namely, alleged forced sterilization and/or severe economic sanction for violating China's family planning policy against having more than one child.[5]

## 1. **Forced Sterilization**

To obtain withholding of removal based upon a fear of forced sterilization, Mr. Chen must show: "(1) proof of the details of the family planning policy relevant to [him]; (2) [he] violated the policy; and (3) the violation of the family planning policy would be punished in the local area [in China] in a way that would give rise to an objective fear of future persecution."  *Mu Ying Wu v. U.S. Att'y Gen.*, 745 F.3d 1140, 1155 (11th Cir. 2014) (quotation marks omitted).

The IJ concluded that "[t]here is little evidence that the [family planning] policy is enforced in such a way that Respondent will not be able to avoid any adverse harm to himself if he were to return to China."  *In the Matter of Xuejun Chen* (Immig. Ct. Atlanta, GA, March 14, 2012), at 13.  The BIA affirmed, noting that "much of the respondent's documentary evidence does not address current family planning policies, and is general in nature and cumulative of documentation analyzed in our published Board decisions."  *In re Xuejun Chen*, (B.I.A. June 7,

---

[5] As noted, Mr Chen has two children, both of whom were born in the U.S.

2013), at 3.  The BIA also stated that Mr. Chen's evidence "does not demonstrate that forcible sterilizations are mandated in the respondent's home province after the birth of a second United States citizen child.  **Indeed, the evidence establishes no uniform policy regarding the implementation of the population control law with respect to children born outside of China.**"  *Id.* (emphasis added).

Based upon our review of the record, we find there is substantial evidence to support the conclusions of the IJ and the BIA.  Much of Mr. Chen's materials, such as the 2009 and 2010 State Department Human Rights Reports, provided (only) general information regarding China's birth limitation policies—found in the 2002 National Population and Family-planning Law—and showed that implementation of that law varied widely among China's localities.  *See  Matter of J-H-S-*, 24 I. & N. Dec. 196, 202 (BIA 2007), *aff'd*, *Shao v. Mukasey*, 546 F.3d 138 (2d Cir. 2008) ("In the past, enforcement efforts in Fujian Province, where the respondent comes from, were specifically described as 'lax' or 'uneven' in published reports and court decisions."); *Yang*, 418 F.3d at 1203 ("[T]he Fujian province, is known for its lax enforcement of China's family-planning policies.").  Also, with respect to Fujian Province, Mr. Chen's home province, Mr. Chen provided a copy of an unofficial translation of the Population and Family Planning Regulation of Fujian Province.  According to the Fujian Population Regulation, "[t]hose who become pregnant in violation of this Regulation should take remedial measures in time";

14

but it also stated that under a number of circumstances, couples may, in fact, be allowed to have a second child.[6]  Mr. Chen also submitted an article containing "Country Advice for China" from the Australian Government's Refugee Review Tribunal which stated that "[c]hildren born outside of China may not be subject to the penalties set out in the Fujian family planning legislation."

In sum, Mr. Chen did not present any particularized evidence that showed that he would more likely than not be subject to forced sterilization upon his return to Fujian Province as a result of having two U.S.-born children.  Substantial evidence supports the IJ and the BIA's denial of Mr. Chen's application for withholding of removal on this ground.

## 2. Economic Persecution

We consider separately Mr. Chen's claim that he would be subject to a severe fine for violating China's family planning policy.  This Court has held that "[f]ines may amount to persecution if they cause a severe economic disadvantage, considering the alien's net worth, other sources of income, and the conditions of the local economy."  *Wu*, 745 F.3d at 1156.  To satisfy this standard, "the fine should reduce the alien to an impoverished existence." *Id.*

The BIA concluded that, "while some individuals may be subject to economic penalties or sanctions for . . . births [of children born in violation of the

---

[6] For example, Chinese citizens returning from overseas are permitted to have a second child if they had already become pregnant at the time they returned to China.

family planning policy], the respondent's evidence does not establish penalties or sanctions rising to the level of persecution or that it is more likely than not that he would be subjected to such persecution." *In re Xuejun Chen*, (B.I.A. June 7, 2013), at 3.

Substantial evidence supports the BIA's conclusion. For one thing, as noted above, it is unclear whether Mr. Chen's U.S.-born children would be considered under China's family planning policy. *See* n.6, above. Even assuming, *arguendo*, they were and that Mr. Chen were to be fined for violating the policy, the record does not compel the conclusion that such a fine would amount to persecution, *i.e.*, reduce Mr. Chen to impoverishment. Referring to the 2010 State Department Human Rights Report, Mr. Chen contends that China's family planning policy states that the "social compensation fee" could reach ten times a person's annual disposable income. However, that same Report also states that the fee is set and assessed at the local level and it does not specify the amount of the fine(s) that are imposed in Fujian Province.

Mr. Chen did present evidence of an actual fine imposed in Fujian Province in January 2010, which was described as the largest fine ever imposed for violating China's family planning policy. But the article reporting the fine does not describe the economic circumstances of the couple that violated the policy, nor does it state that the fine was ten times their disposable income, the amount that Mr. Chen

16

claims he might face.  And, the Fujian Population Regulation that Mr. Chen relied upon states that the "social compensation fee" for having a first additional unapproved child may be two-to-three times the average annual disposable income of the urban resident or the net average annual income of the rural resident in the year prior to the child's birth.

Mr. Chen failed to establish the amount of the fine to which he would likely be subject.[7]  The record before the IJ and the BIA does not compel a conclusion that it is more likely than not that Mr. Chen would receive a fine, much less a fine that would cause such severe economic disadvantage as to reduce Mr. Chen to an impoverished existence.  *See Wu*, 745 F.3d at 1156–57 (in the context of asylum, concluding that the record did not compel a finding that any fine would be imposed on the petitioner where her children were born in the United States and would not be registered in China, or that even if a fine were imposed, it would reduce the petitioner to an impoverished existence).

### C. **CAT Relief**

To qualify for CAT relief, Mr. Chen had the burden of proving that "it is more likely than not that he . . . would be tortured if removed to the proposed

---

[7] Mr. Chen did present (some) evidence of his economic situation and the wages he expected to be able to earn in China, *i.e.*, 1,000 renminbi per month, and testified that if he returned to China, he would sell his restaurant.  *See In re T-Z-*, 24 I. & N. Dec. 163, 174 (BIA 2007) ("The availability of other sources of income has been a key factor in assessing the impact of economic sanctions.").  *See also Wu*, 745 F.3d at 1156.

country of removal," in this case China.  *Sanchez Jimenez v. U.S. Att'y Gen.*, 492

F.3d 1223, 1239 (11th Cir. 2007) (quoting 8 C.F.R. § 208.16(c)(2)).  The burden of

proof for an applicant seeking withholding of removal under the CAT is higher

than the burden imposed upon an asylum applicant.  *See Al Najjar*, 257 F.3d at

1303.  Torture is the intentional infliction of "severe pain or suffering, whether

physical or mental."  *See* 8 C.F.R. § 208.18(a)(1).  To obtain CAT relief, Mr. Chen

must have demonstrated that torture would be inflicted by the government or with

the government's consent or acquiescence.  *See Reyes–Sanchez v. U.S. Att'y Gen.*,

369 F.3d 1239, 1241 (11th Cir. 2004).[8]

Mr. Chen failed to meet his burden and substantial evidence supports the

BIA's determination that he did not establish that it is more likely than not that he

would be tortured (by or with the acquiescence of the government) if returned to

China.  *See Reyes-Sanchez*, 369 F.3d at 1241–42.  As noted, Mr. Chen provided no

evidence of torture apart from his contention (discussed at pp. 12 to 17, above) that

he might be forcibly sterilized or fined for fathering two children in the U.S. in

violation of China's family planning policy.[9]

---

[8] "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity."  8 C.F.R. § 208.18(a)(7).

[9] In rejecting Mr. Chen's asylum application, DHS stated, with respect to China's family planning policy, that "more emphasis has been placed on fines or 'social compensation fees' which are unlikely to rise to the level of persecution than on more coercive measures such as forced sterilization.  In addition, some documentation indicates that Chinese citizens who have

18

## IV.    Conclusion

For the above-stated reasons, we deny Mr. Chen's petition for review.

**PETITION DENIED.**

---

lived abroad for more than one year and return with more than one child are not processed or dealt with upon return to China."  (Assessment to Refer, No. A200859149, dated Apr. 20, 2011.)